FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 SEP 30 PM 2: 28

U.S. DISTRICT COURT
N.D. OF ALABAMA

SHEILA GOODWIN,               )
                              )
        Plaintiff,            )
vs.                           )     CIVIL ACTION NO. 97-RRA-1698-S
                              )
                              )
SPY SOURCE, INC.,             )                **ENTERED**
                              )
        Defendant.            )                 SEP 3 0 1999

### MEMORANDUM OF OPINION

The plaintiff asserts discrimination claims under 28 U.S.C. §§1331 and 1343; 42 U.S.C. 1981; and 28 U.S.C. §§ 2201 and 2202, as well as a claim for unpaid compensation for work performed. The plaintiff contends that Spy Source, Inc. is a successor to Spy Supply, Inc., so that Spy Source is responsible for the plaintiff's claims. Before the court is Spy Source's motion to dismiss. The plaintiff has filed a response to the defendant's motion, to which the defendant filed a reply. Spy Source's motion is ready for disposition.

### Grounds In Support Of Motion To Dismiss

Spy Source asserts that it was not properly designated as a defendant in the amended complaint. Because there appeared to be some confusion as to the correct name of the entity the plaintiff intended to name, oral argument was set in order to clear up any

confusion. (See Order of June 16, 1999, Ct. Doc. 23). At oral argument, the plaintiff stated, without objection, that the sole defendant in this action is Spy Source, Inc. Accordingly, in an Order entered July 19, 1999, it was stated that the only defendant in this case is Spy Source, Inc. Thus, Spy Source's objection that it was improperly designated has been disposed of. The defendant asserts other grounds in support of its motion to dismiss. Spy Source, Inc. contends that service of the summons and complaint was insufficient. The record shows that Spy Source, Inc. was served on November 19, 1998; although illegible, a signature appears in the block entitled "Signature (Addressee)." In its motion to dismiss, Spy Source, Inc. has not stated how the said service of process was insufficient, and, service appearing valid on its face, the motion to dismiss on this ground should be denied.[1]

Spy Source asserts that the complaint should be dismissed under Rule 12 (b)(6). The defendant further asserts that it is not a successor corporation to Spy Supply, Inc. Although these grounds are stated as separate grounds in Spy Source's motion to dismiss, it appears that the "successor corporation" ground is but the specific statement of why the plaintiff has failed to state a claim against Spy Source.

Spy Source has attached exhibits to its motion to dismiss on successorship grounds. In her written response, the plaintiff refers to the defendant's exhibits, and has also

---

[1] Spy Source's objection that it is not a proper party does not seem to be a distinct ground for dismissal, rather it is essentially the same ground as the "improper party" ground or the "improper designation" ground.

2

submitted exhibits of her own. Deciding the successor corporation issue on the materials submitted by both parties requires a conversion of the motion to dismiss to a motion for summary judgment. Rule 12(b)(6), *Federal Rules of Civil Procedure*. Thus, Spy Source's Rule 12 (b)(6) motion will be treated as a motion for summary judgment.

### Summary Judgment Standard

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P.56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who

carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact, 'since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted). "Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.*, 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronic [Techniques, Inc. v. Wackenhut Protective Systems, Inc.]*, 669 F.2d [1026] at 1031 [(5th Cir.1982)]; *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir.1970)." *Treister v. City of Miami*, 893 F. Supp. 1057, 1059 (S.D. Fla. 1992).

## Discussion

The defendant cites *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451 (11th Cir.1985), which sets out the following principles of law. The majority of states hold that successor liability begins with a transfer of assets. If there is a transfer of assets, the general rule is that the corporation which purchases the assets of another corporation does not assume that corporation's debts and liabilities. There are four exceptions to the general rule: (1) the buyer expressly or impliedly agrees to assume the debts; (2) the transaction amounts to a de facto merger of the buying and selling corporations; (3) the buying corporation is a mere continuation (or reincarnation) of the selling corporation; or (4) the transaction is entered into fraudulently, in order to avoid debts. The party asserting successor liability has the burden of proving one of the four exceptions to the general rule. In determining whether a plaintiff has established one of the exceptions, case law sets out certain factors for consideration. The subject of *Bud Antle* was a debt on open account, wherein the plaintiff alleged a de facto merger. More to the point, however, are cases involving federal claims.

Both Sheila Goodwin and Spy Source cite a case from the Middle District of Alabama, *Knox v. Brundidge Shirt Corporation*, 942 F. Supp. 522 (M.D. Ala. 1996). This case dealt with successor corporations in the context of unfair labor practices. The plaintiff quotes that case's statement of the "two-tier" test:

> A corporation, which is found to be the successor of another corporation, can be held liable for the predecessor's unfair labor practices, but only if the successor

5

> knew of the labor law violations at the time of the transfer of the business. *Evans Service, Inc. v. NLRB*, 810 F.2d 1089 (11th Cir. 1987). A two-step inquiry is involved in determining a successor's liability for a predecessor's unfair labor practices. First, the court "must find that the new business retains common aspects of the prior business sufficient to allow the legal conclusion of "successorship." *Evans Services*, 810 F.2d at 1092. Second, the court "must conclude that the successor knew of the unfair labor practices at the time it purchased the business." *Id*.

*Knox,* 942 F. Supp. at 527. The defendant also relies on this case, and, in addition to the two-tier test, quotes the factors the district court set out in determining whether the two-tier test was met:

> In determining the "successorship" status of [a corporation], the court must consider the following factors: the similarity of members of the boards of directors of the two corporations; whether both corporations used the same equipment; whether they operated at the same location; whether they operated in the same line of business and employed the same employees; whether advertisements directly linked the two corporations; and whether the new corporation began its business just after the old corporation closed its business. *Id.* at 1092-93.

*Id.*

Brundidge was a shirt manufacturer for whom Rubye Knox worked as a sewing machine operator. Brundidge discharged Knox in November, 1994. Negotiations between Brundidge and Russell Corporation concerning the sale of Brundidge assets began in June, 1995. In September, 1995, Russell purchased twenty-nine per cent of Brundidge's assets. Following this purchase, Brundidge went out of business. Knox then sued both Brundidge and Russell, asserting ADEA, ADA, and retaliatory discharge claims. The court noted that Knox, in responding to Russell's motion for summary judgment, alleged simply that some of Brundidge's management supervisory personnel became employed as management

6

supervisory personnel at Russell, and that Knox did not submit any summary judgment evidence. The court stated that only twenty-nine per cent of Brundidge's assets were purchased by Russell, and granted Russell's summary judgment motion.

The plaintiff cites another discrimination case, *Rojas v. TK Communications, Inc.*, 87 F.3d 745 (5th Cir. 1996). *Rojas* listed the nine factors the Seventh Circuit stated should be considered in determining a successorship claim, and then commented on those factors:

> In *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974), the court identified nine factors to be considered in determining whether successor liability should be imposed in a discrimination case. These factors are:
>
>> (1) whether the successor company had notice of the charge or pending lawsuit prior to acquiring the business or assets of the predecessor; (2) the ability of the predecessor to provide relief; (3) whether there has been a substantial continuity of business operations; (4) whether the employer uses the same plant; (5) whether he uses the same or substantially the same work force; (6) whether he uses the same or substantially the same working conditions; (8) whether he uses the same machinery, equipment, and methods of production; and (9) whether he produces the same product.
>
> *Muskikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985) (paraphrasing *MacMillan*). This court agrees with *Musikiwamba* that the first two factors are critical. *Id.* The remaining seven simply "provide a foundation for analyzing the larger question of whether there is a continuity in operations and the work force of the successor and predecessor employers," as required by *Wiley* and its progeny. *Id.* at 751; *see also Bates v. Pacific Maritime Ass'n*, 744 F.2d 705, 709-10 (9th Cir.1984) (three factors governing successor liability determination are (1) continuity in operations and workforce, (2) notice of the claim, and (3) ability of predecessor employer to provide relief); *Preyer v. Gulf Tank & Fabricating Co.*, 826 F.Supp. 1389, 1395 (N.D. Fla.1993); *cf. Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093, 1095 (9th Cir.) (applying *Bates* factors in age discrimination case), *cert. denied*, 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989).

87 F.3d at 750.

In *Rojas*, the plaintiff worked as a disc jockey for one of TK Communications' radio stations. She asserted that she was the victim of sexual harassment and retaliation. Apparently because of the discrimination and retaliation, Rojas resigned her position as disc jockey. Tichenor purchased the assets of this radio station and operated it in much the same way as TK had. Also, not only did Tichenor know of Rojas' claims, in the purchase agreement Tichenor expressly excepted responsibility for those claims while expressly assuming certain other pre-transfer obligations of TK. The *Rojas* court examined the policy of the successor corporation doctrine, which was to protect an employee when the ownership of his employer suddenly changes. The court held that that policy was not served by imposing Rojas' claims on Tichenor. The court pointed out that TK still operated five other radio stations and thus was a viable entity against whom the plaintiff could proceed with her claims.[2] The court held that "[u]nder these circumstances, it would be unjust to impose liability on Tichenor for the mere purpose of enhancing Rojas' ability to collect a money judgment." *Id.* at 750.

*Rojas* demonstrates the difference between assumption of debts by agreement or contract on the one hand and successorship law on the other. The latter does not depend upon the agreement of the buying corporation to assume the debts of or responsibility for claims against the selling corporation, rather successor liability is determined according

---

[2]Rojas did not seek reinstatement, as she had rejected Tichenor's offer of reemployment with conditions designed to prevent harassment.

to the relationship between the two companies. In accord is *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler*, 10 F.3d 1563 (10th Cir. 1994), another case cited by the plaintiff, which states that a "[s]uccessor relationship created by labor law principles arises by operation of law and is not dependent upon agreement by successor that it should have successor status." *Id.* at 1566.[3]

Although *Road Sprinkler* held that the successorship doctrine had no application in that case, the Seventh Circuit set out a list of criteria which it deemed "useful in determining whether one employer is the successor of another." *Id.* at 1567. They are whether there has been a substantial continuity of the same business operations, whether the new employer uses the same plant, whether the same or substantially the same work force is employed, whether the same jobs exist under the same working conditions, whether the same supervisors are employed, whether the same machinery, equipment, and

---

[3]In *Road Sprinkler*, a union brought a grievance over whether Moore Pipe & Sprinkler Company, a union contractor, was improperly diverting work to Independent Sprinkler & Fire Protection Company (Independent I), a non-union contractor. The union filed suit to compel arbitration, and a signed settlement was reached between the union, Moore Pipe Sprinkler, and, although it was not a party to the action, Independent I. The agreement provided that any unresolved issue arising out of the settlement agreement would be referred to arbitration. The agreement stated that it was binding on the successors of the signatories. Independent II was subsequently organized and performed the same type work as Independent I. Thereafter a labor dispute arose, and the Union sought to compel arbitration, alleging that Independent II was the successor corporation to Independent I. The trial court found in favor of the union. The appellate court stated that "[t]he successorship doctrine may not be utilized to force an alleged successor employer, Independent II, into a collective bargaining relationship in which its alleged predecessor, Independent, was not a participant." *Id.* at 1567. The Eleventh Circuit also stated that "a duty [to arbitrate] arises out of contract. A duty to arbitrate does not arise because a court thinks it is a good thing to require in the circumstances or because national labor favors it. A party cannot be required to submit to arbitration a dispute that it has not agreed to arbitrate." *Id.* at 1567.

9

methods of production are used, and whether the same product is manufactured or the same service offered. *Id.* The *Road Sprinkler* factors are simply factors which are relevant to a determination of one of the steps of the two-step test quoted by both parties in the instant case: characteristics linking the alleged successor corporation to the first corporation.

The plaintiff also relies on *Golden State Bottling Co. v. National Labor Relations Board*, 414 U.S. 168 (1973). In this case, All American Beverages, Inc. bought Golden State Bottling Company, Inc.'s soft drink bottling and distribution business. The purchase occurred after the National Labor Relations Board had ordered Golden State to reinstate, with back pay, a Golden State employee whose discharge was found by the Board to have constituted an unlawful labor practice. The Board found that after the acquisition All American continued to carry on the business without interruption or substantial changes in method of operation, employee complement, or supervisory personnel. Sheila W. Goodwin emphasizes the Board's additional finding that although All American was a bona fide purchaser of the business, unconnected with Golden State, All American acquired the business with knowledge of the outstanding order to reinstate the former Golden State employee. The court stated:

> Eugene Schilling, Golden State's secretary and manager of the bottling business, who had discharged Baker and then closely followed the progress of the litigation,

10

continued with the enterprise under All American's ownership with the title of general manager and "president." Indeed, All American's purchase of the business was conditioned on Schilling staying on in a managerial capacity; the sales contract expressly stipulated that Schilling "shall have agreed to be employed by [All American] for a period of one year after the closing date as general manager. . . ." Schilling participated on at least one occasion with Golden's president, Edwin J. Crofoot, in the sale negotiations. Even if strict agency principles would not impute Schilling's knowledge to All American until Schilling actually entered its employ, the Court of Appeals cannot be said to have "misapprehended or grossly misapplied" the governing standard in appraisal this evidence as sufficiently substantial to support an inference that Schilling informed his prospective employer of the litigation before completion of the sale.

*Golden State Bottling Co. v. NLRB*, 414 U. S. 168, 173 (1973).[4]

Plaintiff Goodwin's complaint alleges that she was offered full-time employment from Spy Supply on April 7, 1997, and that her employment was terminated in May, 1997. Edward M. Cousins, the "President and owner" of the defendant, Spy Source, Inc., submitted his affidavit and other documents in support of Spy Source's motion to dismiss. That evidence provides the following facts.

In 1994, Cousins and his wife, Sheila Cousins, created Spy Supply, Inc. Sheila was president and Edward was Secretary/Treasurer. The corporation operated two stores. In November, 1995, Sheila and Edward divorced. As part of the divorce decree, Sheila Cousins, now Sheila Stevens, became the sole owner of Spy Supply, Inc.; Mr. Cousins was divested of all his interest in Spy Supply after the expiration of that fiscal year, when he

---

[4]The court stated that the National Labor Relations Board's remedial powers include broad discretion to fashion remedies to achieve the ends and effectuate the policies of the National Labor Relations Board Act.

11

was to receive some portion of the company's profits; and Ms. Stevens assumed all debts of the business and was to hold Edward harmless therefrom, except for a note Mr. Cousins and Ms. Stevens jointly owed First Commercial Bank. It is not clear whether this bank debt was incurred for reasons benefitting Spy Supply; however, for summary judgment purposes it must be assumed that the debt was a debt incurred on behalf of Spy Supply.

In the spring of 1997, Spy Supply ceased doing business. In June of 1997, Ms. Stevens declared Chapter 7 bankruptcy. As shown in the letter from Sheila Cousins' lawyer, the bankruptcy was Sheila Stevens' personal bankruptcy only. *Court Document 11.* Shortly after this bankruptcy, Edward satisfied the First Commercial Bank note. In exchange for satisfying this debt and signing a new bank note in October, 1997, Mr. Cousins received the remaining Spy Supply inventory the bank had taken when it foreclosed on a lien. Mr. Cousins states that from late 1995 onward, the time of the divorce, he had nothing to do with and knew nothing about the daily operations of Spy Supply.

In late November, 1997, Edward Cousins, as its "sole owner," opened Spy Source, Inc. None of the former employees of Spy Supply was hired. Spy Source is not located in either of Spy Supply's former locations. Edward knew nothing of plaintiff Sheila Goodwin or her allegations until he received the amended complaint on November 20, 1998.

Goodwin contends that the two-step inquiry clearly shows that Spy Source is a

successor corporation. Spy Supply was and Spy Source is in the business of buying and selling surveillance equipment. Spy Source bought Spy Supply's inventory to use in its, Spy Source's, business. Pointing to the list of debtors filed in Sheila Steven's Chapter 7 bankruptcy proceedings, the plaintiff asserts that the court must conclude that Spy Source "knew of the unfair labor practices at the time it purchased the business." *Plaintiff's Response To Defendant's Motion To Dismiss*, p. 3. The plaintiff also contends, citing *Golden State Bottling*, that Edwards' position as an officer of Spy Supply imputed knowledge of her claims.

## Conclusion

There is no evidence that Edward Cousins knew the contents of the Chapter 7 Bankruptcy filings; he states in his affidavit that he did not. Even if he had such knowledge, Mr. Cousins would have known only of the plaintiff's unspecified claims against Sheila Cousins. The evidence shows that the plaintiff's claims arise out of events occurring from April, 1997-May, 1997, a period of time occurring wholly after Edward Cousins had completely severed his relationship with Spy Supply, except, by virtue of the divorce decree, his obligation on the bank note. The Spy Supply inventory, what remained at the time, was purchased from First Commercial Bank, not Ms. Stevens or Spy Supply, and for which inventory Mr. Cousins signed a new note. Although the nature of Spy

13

Source's business is the same as Spy Supply's, Spy Source is a completely separate entity. Spy Source operates from a different location. Spy Source has hired only one employee, and he never worked for Spy Supply. Ms. Stevens had no connection with Spy Source. It is concluded as a matter of law that the plaintiff cannot establish that Spy Source, Inc. is the successor of Spy Supply, Inc. so as to be liable for any of the plaintiff's claims. There is not the requisite knowledge by Edward Cousins and his corporation of the plaintiff's claims. Neither is there the kinship between Spy Supply and Spy Source necessary to establish successorship.

Wherefore, defendant Spy Source, Inc.'s motion to dismiss on grounds other than successorship are due to be denied. Spy Source's motion for summary judgement on successorship grounds is due to be granted and this action dismissed with prejudice, with costs taxed to the plaintiff. An order in accordance with this memorandum of opinion will be entered.

DONE this 27th day of September, 1999.

Robert R. Armstrong, Jr.
United States Magistrate Judge